**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| ADRION HARRIS, LASHAWNDA SHARKEY, BRENDA DONELSON, LINDA RIZZA, DEBRA SEEDLER, and MARCIA BROWN, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>SUPERVALU, INC.<br><br>    Defendant. | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT AND COMPLAINT FOR DAMAGES**<br><br>**Jury Trial Demanded** |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiffs Adrion Harris, Lashawnda Sharkey, Brenda Donelson, Linda Rizza, Debra Seedler, and Marcia Brown ("Plaintiffs"), individually and on behalf of themselves and all others similarly situated, brings this class action lawsuit against Defendant SuperValu, Inc. ("Defendant") based upon personal knowledge as to themselves, the investigation of their counsel, and on information and belief as to all other matters.

## <u>INTRODUCTION</u>

1. This is a class action lawsuit against Defendant regarding the manufacture, distribution, and sale of its Equaline "Non-Drowsy" over-the-counter cold and flu medicines that contain Dextromethorphan Hydrobromide ("the "Non-Drowsy Products").

2. The Non-Drowsy Products state prominently on the front of their product packaging that they are "Non-Drowsy" and "Daytime" products.

1

3.      By prominently labeling the products as "Non-Drowsy," Defendant led Plaintiffs and other consumers to believe that the Non-Drowsy Products do not cause drowsiness, and that drowsiness is not a side effect of the products.

4.      Defendant also led Plaintiffs and other consumers to believe that the Non-Drowsy Products are for use during the "Daytime" and intended to be used during waking hours.

5.      However, one of the active ingredients in the Non-Drowsy Products is Dextromethorphan Hydrobromide ("DM HBr"). While the average consumer may not be aware, drowsiness is a documented side effect of DM HBr at the recommended dosages. Authorities such as the National Library of Medicine and Mayo Clinic list drowsiness as a side effect of this ingredient.[1]

6.      Plaintiffs and Class members purchased the Non-Drowsy Products with the expectation that the products would not cause drowsiness and that they were intended to be used during waking hours. Because Defendant sold products to consumers that cause drowsiness, Plaintiffs and the Classes were deprived of the benefit of their bargain.

7.      Accordingly, Plaintiffs bring this action on behalf of themselves and the Class for equitable relief and to recover damages and restitution for: (i) Violation of Consumer Protection Statutes; (ii) violations of Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2, *et seq*); and (iii) unjust enrichment.

## PARTIES

8.      Adrion Harris is a citizen and resident of Carol, Illinois. Mr. Harris purchased the Non-Drowsy Product on December 1, 2021 in Carol, Illinois. Mr. Harris paid approximately

---

[1]Dextromethorphan: MedlinePlus Drug Information, National Library of Medicine, https://medlineplus.gov/druginfo/meds/a682492.html (last accessed March 23, 2022); *Mayo Clinic, Drugs and Supplements Dextromethorphan (Oral Route)*, https://www.mayoclinic.org/drugs-supplements/dextromethorphan-oral-route/side-effects/drg-20068661?p=1 (last accessed March 23, 2022).

$13.00 for the Non-Drowsy Product. Mr. Harris purchased the Non-Drowsy Product because of the representations that the Product was "non drowsy" and for "daytime" use. Although the Non-Drowsy Product was more expensive than other choices he viewed, Mr. Harris chose to pay the premium price based upon the various claims and promises made by SuperValu. At the time of his purchase, Mr. Harris relied on SuperValu's factual representations on the product label. All of the representations made by SuperValu regarding the Non-Drowsy Product purchased by Mr. Harris were false because the Non-Drowsy Product contains DM HBr, which is known to cause drowsiness. Hence, the Non-Drowsy Product is not "non drowsy" and not suited for "daytime" use. Mr. Harris did not receive the benefit of his bargain and paid a price premium. Mr. Harris would purchase the Non-Drowsy Products again if they were actually "Non-Drowsy" (i.e., if the product was sold as advertised). Mr. Harris, however, faces an imminent threat of harm because he will not be able to rely on the labels in the future, and thus will not be able to purchase the products.

9.      Lawshawnda Sharkey is a citizen and resident of Addison, Illinois. Ms. Sharkey purchased the Non-Drowsy Product on May 2, 2022 in Addison, Illinois. Ms. Sharkey paid approximately $10.00 for the Non-Drowsy Product. Ms. Sharkey purchased the Non-Drowsy Product because of the representations that the Non-Drowsy Product was "non drowsy" and for "daytime" use. Although the Non-Drowsy Product was more expensive than other choices she viewed, Ms. Sharkey chose to pay the premium price based upon the various claims and promises made by SuperValu. At the time of her purchase, Ms. Sharkey relied on SuperValu's factual representations on the Non-Drowsy Product label. All of the representations made by SuperValu regarding the Non-Drowsy Product purchased by Ms. Sharkey were false because the Non-Drowsy Product contains DM HBr, which is known to cause drowsiness. Hence, the Non-Drowsy Product is not "non drowsy" and not suited for "daytime" use. Ms. Sharkey did not receive the benefit of her bargain and paid a price premium. Ms. Sharkey would purchase the Non-Drowsy Products again if they were actually "Non-Drowsy" (i.e., if the product was sold as advertised). Ms.

Sharkey, however, faces an imminent threat of harm because she will not be able to rely on the labels in the future, and thus will not be able to purchase the products.

10.     Brenda Donelson is a citizen and resident of Aurora, Illinois. Ms. Donelson purchased the Non-Drowsy Product on March 3, 2022 in Aurora, Illinois. Ms. Donelson paid $10.98 for the Non-Drowsy Product. Ms. Donelson purchased the Non-Drowsy Product because of the representations that the Non-Drowsy Product was "non drowsy" and for "daytime" use. Although the Non-Drowsy Product was more expensive than other choices she viewed, Ms. Donelson chose to pay the premium price based upon the various claims and promises made by SuperValu. At the time of her purchase, Ms. Donelson relied on SuperValu's factual representations on the Non-Drowsy Product label. All of the representations made by SuperValu regarding the Non-Drowsy Product purchased by Ms. Donelson were false because the Non-Drowsy Product contains DM HBr, which is known to cause drowsiness. Hence, the Non-Drowsy Product is not "non drowsy" and not suited for "daytime" use. Ms. Donelson did not receive the benefit of her bargain and paid a price premium. Ms. Donelson would purchase the Non-Drowsy Products again if they were actually "Non-Drowsy" (i.e., if the product was sold as advertised). Ms. Donelson, however, faces an imminent threat of harm because she will not be able to rely on the labels in the future, and thus will not be able to purchase the products.

11.     Linda Rizza is a citizen and resident of Huntley, Illinois. Ms. Rizza purchased the Non-Drowsy Product on January 21, 2022 in Huntley, Illinois. Ms. Rizza paid approximately $8 for the Non-Drowsy Product. Ms. Rizza purchased the Non-Drowsy Product because of the representations that the Non-Drowsy Product was "non drowsy" and for "daytime" use. Although the Non-Drowsy Product was more expensive than other choices she viewed, Ms. Rizza chose to pay the premium price based upon the various claims and promises made by SuperValu. At the time of her purchase, Ms. Rizza relied on SuperValu's factual representations on the Non-Drowsy Product label. All of the representations made by SuperValu regarding the Non-Drowsy Product purchased by Ms. Rizza were false because the Non-Drowsy Product contains DM HBr, which is known to cause drowsiness. Hence, the Non-Drowsy Product is not "non drowsy" and not suited

4

for "daytime" use. Ms. Rizza did not receive the benefit of her bargain and paid a price premium. Ms. Rizza would purchase the Non-Drowsy Products again if they were actually "Non-Drowsy" (i.e., if the product was sold as advertised). Ms. Rizza, however, faces an imminent threat of harm because she will not be able to rely on the labels in the future, and thus will not be able to purchase the products.

12.     Debra Seedler is a citizen and resident of Lynwood, Illinois. Ms. Seedler purchased the Non-Drowsy Product on February 19, 2022 in Lynwood, Illinois. Ms. Seedler paid approximately $5 for the Non-Drowsy Product. Ms. Seedler purchased the Non-Drowsy Product because of the representations that the Non-Drowsy Product was "non drowsy" and for "daytime" use. Although the Non-Drowsy Product was more expensive than other choices she viewed, Ms. Seedler chose to pay the premium price based upon the various claims and promises made by SuperValu. At the time of her purchase, Ms. Seedler relied on SuperValu's factual representations on the Non-Drowsy Product label. All of the representations made by SuperValu regarding the Non-Drowsy Product purchased by Ms. Seedler were false because the Non-Drowsy Product contains DM HBr, which is known to cause drowsiness. Hence, the Non-Drowsy Product is not "non drowsy" and not suited for "daytime" use. Ms. Seedler did not receive the benefit of her bargain and paid a price premium. Ms. Seedler would purchase the Non-Drowsy Products again if they were actually "Non-Drowsy" (i.e., if the product was sold as advertised). Ms. Seedler, however, faces an imminent threat of harm because she will not be able to rely on the labels in the future, and thus will not be able to purchase the products.

13.     Marcia Brown is a citizen and resident of Chicago, Illinois. Ms. Brown purchased the Non-Drowsy Product on January 18, 2022 in Chicago, Illinois. Ms. Brown paid approximately $11 for the Non-Drowsy Product. Ms. Brown purchased the Non-Drowsy Product because of the representations that the Non-Drowsy Product was "non drowsy" and for "daytime" use. Although the Non-Drowsy Product was more expensive than other choices she viewed, Ms. Brown chose to pay the premium price based upon the various claims and promises made by SuperValu. At the time of her purchase, Ms. Brown relied on SuperValu's factual representations on the Non-Drowsy

Product label. All of the representations made by SuperValu regarding the Non-Drowsy Product purchased by Ms. Brown were false because the Non-Drowsy Product contains DM HBr, which is known to cause drowsiness. Hence, the Non-Drowsy Product is not "non drowsy" and not suited for "daytime" use. Ms. Brown did not receive the benefit of her bargain and paid a price premium. Ms. Brown would purchase the Non-Drowsy Products again if they were actually "Non-Drowsy" (i.e., if the product was sold as advertised). Ms. Brown, however, faces an imminent threat of harm because she will not be able to rely on the labels in the future, and thus will not be able to purchase the products.

14.     SuperValu is a corporation with its principal place of business and headquarters located at 7075 Flying Cloud Drive, East View Innovation Center, Eden Prairie, MN 55344. At all relevant times hereto, Defendant was engaged in manufacturing, marketing, distributing, and advertising Non-Drowsy Products throughout the United States. Defendant created and/or authorized the false and misleading advertising and labeling of the Non-Drowsy Products. the false and misleading advertising and labeling of the Non-Drowsy Products.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than one hundred (100) Class members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class member is a citizen of a state different from the Defendant.

16.     This Court has personal jurisdiction over Defendant because Defendant sold the Non-Drowsy Products to consumers in Illinois, including to Plaintiffs. Defendant derives substantial revenue from sales of its products in this State, with knowledge that its products are being marketed and sold for use in this State.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of Defendant's conduct giving rise to the claims occurred in this District, including Plaintiff Adrion Harris and Plaintiff Marcia Brown's purchase of the Non-Drowsy Products within this District.

## FACTUAL ALLEGATIONS

**A.**    **Defendant Manufactures, Distributes, Markets, and Sells the Non-Drowsy Products**

18.     Defendant manufactures, distributes, markets, and sells the Non-Drowsy Products.

19.     Each of the Non-Drowsy Products prominently state on its label that the product is "Non-Drowsy" and for "Daytime" use.

20.     For example, below is an image Equaline's non-drowsy, multi-symptom daytime cold & flu relief:



21.     The "Daytime" product includes the "Non-Drowsy" representation.

22.     Based on the prominent "Non-Drowsy" and "Daytime" representations included on the front of the product, a reasonable consumer would believe that the products do not cause

drowsiness and that drowsiness is not a side effect of the product.

23.     The product contains Dextromethorphan HBr, the ingredient that causes drowsiness:



**B.**     <u>**Defendant's False and Misleading Advertising Campaign**</u>

24.     One of the active ingredients in the Non-Drowsy Products is DM HBr.

25.     Drowsiness is a well-documented side effect of DM HBr.

26.     For example, the Mayo Clinic and the National Library of Medicine list drowsiness as a side-effect of the ingredient.[2]

27.     Manufacturers and distributors know that DM HBr causes drowsiness as their safety data sheets ("SDS") explicitly state that DM HBr causes and may cause drowsiness.

28.     According to Pfizer's safety datasheet for their Robitussin cough medicine. "Common adverse reactions associated with the clinical use of dextromethorphan hydrobromide include drowsiness, dizziness, and nausea and vomiting."[3]

---

[2]*Dextromethorphan:     MedlinePlus     Drug     Information,     National     Library     of     Medicine*, https://medlineplus.gov/druginfo/meds/a682492.html (last accessed March 23, 2022); *Mayo Clinic, Drugs and Supplements Dextromethorphan (Oral Route)*, https://www.mayoclinic.org/drugs-supplements/dextromethorphan-oral-route/side-effects/drg-20068661?p=1 (last accessed March 23, 2022).
[3]*Pfizer, Safety Data Sheet*, https://imgcdn.mckesson.com/CumulusWeb/Click_and_learn/SDS_9PFIZ_ROBITUSSIN_DM_SYRP_ADLT_CO UGH_CHEST_HONEY_4OZ.pdf (last accessed March 23, 2022).

29.     Santa Cruz Biotechnology Inc lists acute health effects on their SDS following the consumption of DM HBr such as "Drowsiness, dizziness, excitation, mental confusion, and gastro-intestinal disturbances have been described following dextromethorphan. Administration."[4]

30.     Peer-reviewed studies have also confirmed that drowsiness is a side effect of DM HBr at the recommended dosages.  For example, one study found that "[s]omnolence is a common side effect of centrally acting antitussive drugs" like DM HBr, and that 10.4% of users of products containing DM HBr develop drowsiness within three days of starting treatment with DM HBr cough medicine. [5, 6] The "cases of intense somnolence" were "related only to dextromethorphan" and not to the other drug studied.  And the patients in this clinical study were given an even smaller dosage of DM HBr (15 mg three times a day) than the recommended dose found in Non- Drowsy products.[7]

31.     In other words, sedation is a well-known adverse event of this ingredient.[8]

32.     In fact, the Federal Aviation Administration prohibits pilots from flying after taking medicines that contain dextromethorphan. The document titled, "What Over-the-Counter (OTC) medications can I take and still be safe to fly" lists DayQuil as a "No Go" product because it contains dextromethorphan.[9] The Non-Drowsy Products and DayQuil both contain this ingredient.

---

[4]  Dextromethorphan Hydrobromide, Material Safety Data Sheet, https://datasheets.scbt.com/sc-204716.pdf (last accessed March 23, 2022).

[5] E. Catena and L. Daffonchio, "Efficacy and Tolerability of Levodropropizine in Adult Patients with Non-productive Cough, Comparison with Dextromethorphan," 10 Pulmonary Pharmacology & Therapeutics 89-96 (1997).

[6] The study reports this side effect as "somnolence." Somnolence means "the quality or state of being drowsy." Merriam Webster Dictionary, https://www.merriamwebster.com/dictionary/somnolence

[7]  For example, Equaline non-drowsy, multi-symptom daytime cold & flu relief softgels contain 10mg of DM HBr per softgel and the recommended dosage is 2 softgels (20mg of DM HBr) every 4 hours.

[8]  *See* Martin, E., Narjoz, C., Decleves, X., Labat, L., Lambert, C., Loriot, M. A., ... & Pickering, G. (2019). Dextromethorphan analgesia in a human experimental model of hyperalgesia. *Anesthesiology*, *131*(2), 356-368; *see also* Siu, A. and Drachtman, R. (2007), Dextromethorphan: A Review of N-methyl-d-aspartate Receptor Antagonist in the Management of Pain. CNS Drug Reviews, 13: 96-106. https://doi.org/10.1111/j.1527-3458.2007.00006.x ("DM is used clinically in the form of salt, dextromethorphan hydrobromide…The majority of DM's adverse effects occur at the level of the CNS. Neurologic toxicity associated with DM includes dystonia, fatigue, drowsiness, and dizziness.").

[9] *Federal Aviation Administration, What Over-the-Counter (OTC) medications can I take and still be safe to fly* https://www.faa.gov/licenses_certificates/medical_certification/media/OTCMedicationsforPilots.pdf  (last accessed March 23, 2022).

33.     The Non-Drowsy Products do not qualify the voluntary deceptive statements "Non-Drowsy" and "Daytime" with a disclaimer or qualification anywhere on the packaging; in other words, they do not disclose anywhere on the packaging that even though the Non-Drowsy Products affirmatively claim to be "Non-Drowsy" and "Daytime," they actually do or can cause drowsiness, or that drowsiness is a side effect.  Accordingly, there is nothing on the packaging that could possibly cure or ameliorate the deception caused by the affirmative "Non-Drowsy" and "Daytime" representations.[10]

34.     As such, Defendant's advertising campaign is false and misleading.

35.     The Food and Drug Administration ("FDA") prohibits labeling drugs with "false or misleading" statements. 21 C.F.R. § 201.6. It is misleading to label a product "Non-Drowsy" when it does cause drowsiness, or if drowsiness is a known side effect of one of its active ingredients.

36.     Based on the fact that Defendant labelled the Non-Drowsy Products as "Non-Drowsy," a reasonable consumer would expect that those products do not cause drowsiness. Similarly, a reasonable consumer would expect that drowsiness is not a side effect of the products (much less a common side effect).  Indeed, according to Consumer Reports, "'Non-drowsy' is code for antihistamines and other medications that don't make you sleepy."[11]  This is the plain meaning of "non-drowsy," which means "not causing or accompanied by drowsiness."

37.     While the Federal Regulations relating to the labelling of antitussive drug products do not require products with DM HBr to include an affirmative "drowsiness" warning, *see generally*, 21 C.F.R. § 341.74, Defendant could have simply omitted the false and misleading "Non-Drowsy" representations from its product labels.

38.      Defendant knows that its "Non-Drowsy" representation is false and misleading. In fact, Defendant sells products that contain DM HBr but are not advertised as "Non-Drowsy." For

---

[10] To be clear, Plaintiffs do not contend that Defendant has a duty to warn that its products cause drowsiness in the absence of any affirmative misrepresentation; they contend that it is deceptive to affirmatively label the Non-Drowsy Products "Non-Drowsy" and "Daytime."

[11] How to read over the counter (OTC) drug labels, Consumer Reports, https://www.consumerreports.org/cro/2014/04/how-to-read-over-the-counter-druglabels/index.htm

example, Coricidin is a cold symptom relief product for people with high blood pressure. Coricidin is manufactured, sold, and advertised by Defendant. This product contains DM HBr and omits false representations by not labeling the product as "Non-Drowsy."



39. Or, if Defendant wanted to differentiate its Day products from its Night products, it could have indicated on the product label that the Day products would cause *less* drowsiness than the Night products. For example, the below Dramamine product is advertised as a "less drowsy" formula.



40.     Whether or not an over-the-counter drug causes drowsiness is material to a reasonable customer.  In certain situations, consumers prefer over-the-counter drugs that will not make them drowsy to products that may make them drowsy.  For example, all else equal, a reasonable consumer would prefer to take a drug that does not cause drowsiness to one that does cause drowsiness during the day (or any periods of time when they plan to be awake).  Indeed, in many situations, taking a drug that does or can cause drowsiness can be dangerous.  For example, taking a drug that causes drowsiness while driving is dangerous.

41.     Defendant's false statements increased the demand for its Non-Drowsy Products and allowed Defendant to charge a price premium.  As explained above, consumers specifically value the "Non-Drowsy" claim because consumers demand cough medicine that will not make them drowsy (e.g., during the day, at work or while driving).  As a result, Defendant was able to charge more for these products than it would have been able to had the labeling been truthful.  Accordingly, as a direct result of Defendant's false statements, Defendant was able to charge a price premium for these products.  As purchasers, Plaintiffs and each class member paid this price premium and sustained economic injury.

12

42.     In addition, because the Non-Drowsy Products actually do cause drowsiness, Plaintiffs and each class member did not get what they paid for: a cough medicine that does not cause drowsiness.  Instead, they received something that is worth less: a cough medicine that does cause drowsiness.  Plaintiffs and each class member sustained an economic injury for this additional reason, i.e., they received something worth less than the price they paid for it.

43.     Defendant intended that consumers would rely on the "Non-Drowsy" and "Daytime" labeling so that consumers would purchase more products, pay a price premium, and buy them as alternatives to its "Nighttime" products. The product labels do not warn consumers that the products cause drowsiness, may cause drowsiness, or you may get drowsy from the usage of such products thereby creating an unreasonable risk of harm.

**C.     Consumers Have Been Harmed By Defendant's False Representations**

44.     Defendant knew, or should have known, that Defendant's "Non-Drowsy Products" are misbranded because they contain DM HBr which causes drowsiness in consumers.

45.     Defendant knew, or should have known, that products misrepresented material facts concerning the "Non-Drowsy" and "Daytime" representations when in fact the products contained an ingredient that causes drowsiness.

46.     Defendant knew, or should have known, the representations and statements through its labeling prescribes dangerous uses.

Plaintiffs would not have purchased the Non-Drowsy Products, or would have paid less for them, had the Non-Drowsy Products been truthfully and accurately labeled.

**D.     Defendant Has Committed Fraud Under F.R.C.P. Rule 9(b)**

47.     Rule 9(b) of the Federal Rules of Civil Procedure provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting the fraud or mistake." And, while the Defendant is in the best position to know what content they placed in advertising and in other materials during the Class period, to the extent necessary, as detailed in the paragraphs above and below, Plaintiffs have satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity:

48.     **WHO**: Defendant made material misrepresentations and/or omissions of the fact that the Non-Drowsy Products had certain qualities – namely, that they are "non drowsy" and for "daytime use", when they are not non-drowsy nor suited for daytime use.

49.     **WHAT**: Defendant's conduct here was, and continues to be, fraudulent because it omitted and concealed the fact that the representations about the Non-Drowsy Products were false and misleading.

50.     **WHEN**: Upon information and belief, Defendant's conduct here took place during the Class period – with a record reaching as far back as 2016; however, it is possible that the Defendant was selling similar products even earlier than 2016. The Plaintiffs and members of the putative Class will have further clarity on the timing of sales based on the records that the Defendant ultimately provides during the discovery portion of this Action.

51.     **WHERE**: The material misrepresentations and omissions were made on the Defendant's website, on their social media accounts, in advertising and marketing, and the Non-Drowsy Products' labels. The Defendant exerted control over these material misrepresentations and omissions.

52.     **WHY**: Defendant engaged in systematic misrepresentations and omissions because it increased sales of the Non-Drowsy Products and helped Defendant succeed financially, to the detriment of consumers who unwittingly believed in the representations and omissions made by the Defendant.

53.     **HOW**: Defendant made material misrepresentations regarding the non-drowsy nature of the Non-Drowsy Products and failed to disclose anywhere on the packaging that even though the Non-Drowsy Products affirmatively claim to be "Non-Drowsy" and "Daytime," they actually do or can cause drowsiness, and that drowsiness is a side effect of the product.

54.     **INJURY**: Plaintiffs and each class member did not get what they paid for: a cough medicine that does not cause drowsiness.  Instead, they received something that is worth less: a cough medicine that does cause drowsiness.  Plaintiffs and each class member sustained an economic injury because they received something worth less than the price they paid for it.

55.     As such, consumers, such as Plaintiffs and members of the putative Class, were harmed and they would not have purchased or would have paid substantially less for the Non-Drowsy Products had they been advertised correctly.

## CLASS ACTION ALLEGATIONS

56.     Plaintiffs bring this class action lawsuit on behalf of themselves and proposed Classes of similarly situated persons, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

Plaintiffs seek certification of the following Classes:

> **Consumer Protection Multi-State Class:** All persons in the States of California, Florida, Illinois, Massachusetts, Minnesota, Missouri, New Jersey, New York, and Washington who purchased the Non-Drowsy Products.[12]

> **Illinois Subclass:** All persons in the State of Illinois who purchased the Non-Drowsy Products.

57.     Members of the classes described are referred to as "Class Members" or members of the "Classes."

58.     The following are excluded from the Classes: (1) any Judge presiding over this action and members of his or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parent has a controlling interest (as well as current or former employees, officers, and directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

---

[12] The States in the Consumer Protection Multi-State Class are limited to those States with similar consumer protection laws under the facts of this case: California (Cal. Bus. & Prof. Code § 17200, *et seq*.); Florida (Fla. Stat. § 501.201, *et seq*.); Illinois (815 ILCS 505/1, *et seq*.); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq*.); Michigan (Mich. Comp. Laws § 445.901, *et seq*.); Minnesota (Minn. Stat. § 325F.67, *et seq*.); Missouri (Mo. Rev. Stat. 407.010, *et seq*.); New Jersey (N.J. Stat. § 56:8-1, *et seq*.); New York (N.Y. Gen. Bus. Law § 349, *et seq*.); and Washington (Wash Rev. Code § 19.86.010, *et seq*.).

59.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

60.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Classes are so numerous that individual joinder of all Class Members is impracticable. On information and belief, Class Members number in the thousands to millions. The precise number or identification of members of the Classes are presently unknown to Plaintiffs but may be ascertained from Defendant's books and records. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

61.     **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all members of the Classes, which predominate over any questions affecting individual members of the Classes. These common questions of law or fact include, but are not limited to, the following:

    a.   Whether the Non-Drowsy Products cause drowsiness;

    b.   Whether Defendant's labelling of the Non-Drowsy Products as "Non-Drowsy" and "Daytime" is false, misleading, and/or deceptive;

    c.   Whether Defendant violated the state consumer protection statutes alleged herein;

    d.   Whether Defendant was unjustly enriched; and

    e.   The nature of relief, including damages and equitable relief, to which Plaintiffs and members of the Class are entitled.

62.     Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and the other Class Members. Similar

or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

63. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the claims of the other Class Members because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Defendant in violation of law as complained of herein. Further, the damages of each Class Member were caused directly by Defendant's wrongful conduct in violation of the law as alleged herein.

64. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate representatives of the Classes because they are members of the Classes and their interests do not conflict with the interests of the Class Members they seek to represent. Plaintiffs have also retained counsel competent and experienced in complex commercial and class action litigation. Plaintiffs and their counsel intend to prosecute this action vigorously for the benefit of all Class Members. Accordingly, the interests of the Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

65. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

## COUNT I

**Violation of State Consumer Protection Statutes**
**(On Behalf of Plaintiffs and the Consumer Protection Statutes of Multi-State Class)**

66.    Plaintiffs repeat and re-allege the allegations above as if set forth herein.

67.    The Consumer Protection Acts of the States in the Consumer Protection Multi-State Class prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

68.    As alleged in detail above, Defendant's "Non-Drowsy" and "Daytime" representations are false and misleading to Plaintiffs and other reasonable consumers.  Plaintiffs saw and relied upon these misrepresentations.

69.    Defendant intended that Plaintiffs and each of the other members of the Consumer Protection Multi-State Class would rely upon its deceptive conduct, and a reasonable person would in fact be misled by its deceptive conduct.

70.    As a result of the Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiffs, and members of the Consumer Protection Multi-State Class, have sustained damages in an amount to be proven at trial.

71.    In addition, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

## COUNT II

**Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**(On Behalf Plaintiffs and the Illinois Subclass)**

72.    Plaintiffs bring this count on behalf of themselves and the Illinois Subclass and repeat and re-allege all previous paragraphs, as if fully included herein.

73.    Plaintiffs and Illinois Subclass members are consumers under the Illinois Consumer Fraud Act and Defendant is a "person" within the meaning of 815 Ill. Comp. Stat. 510/1(5).

74.     Defendant engaged, and continues to engage, in the wrongful conduct alleged herein in the course of trade and commerce, as defined in 815 ILCS 505/2 and 815 ILCS 510/2.

75.     815 ILCS 505/2 (Illinois Consumer Fraud Act) prohibits:

[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act,' approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

76.     815 ILCS 510/2 provides that a:

person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person does any of the following: "(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; ... (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have...; (7) represents that goods or services are of a particular standard, quality, or grade... if they are not; ... [and] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

77.     Defendant's representations and omissions concerning the representations and omissions at issue were false and/or misleading as alleged herein.

78.     Defendant's foregoing deceptive acts and practices, including its omissions, were likely to deceive, and did deceive, consumers acting reasonably under the circumstances. Consumers, including Plaintiffs and Illinois Subclass Members, would not have purchased the Non-Drowsy Products had they known the Non-Drowsy Products included an ingredient that is known to cause drowsiness. These claims, alone or in tandem, are false, misleading, and/or deceptive.

19

79.     Defendant's false or misleading representations and omissions were such that a reasonable consumer would attach importance to them in determining his or her purchasing decision.

80.     Defendant's false and misleading representations and omissions were made to the entire Illinois Subclass as they were prominently displayed on the packaging of every one of the Non-Drowsy Products and the online pages for the Products.

81.     Defendant knew or should have known their representations and omissions were material and were likely to mislead consumers, including Plaintiffs and the Illinois Subclass.

82.     Defendant's practices, acts, and course of conduct in marketing and selling the Non-Drowsy Products were and are likely to mislead a reasonable consumer acting reasonably under the circumstances to his or her detriment.

83.     Defendant profited from the sale of the falsely, deceptively, and unlawfully advertised the Non-Drowsy Products to unwary consumers.

84.     Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the Illinois Consumer Fraud Act.

85.     Defendant's wrongful business practices were a direct and proximate cause of actual harm to Plaintiffs and to each Illinois Subclass member.

86.     As a direct and proximate result of Defendant's unfair and deceptive trade practices, Plaintiffs and the Illinois Subclass members have suffered ascertainable loss and actual damages. Plaintiffs and the Illinois Subclass members who purchased the Non-Drowsy Products would not have purchased them, or, alternatively, would have paid less for them had the truth about the non-conforming ingredients been disclosed. Plaintiffs and the Illinois Subclass members did not receive the benefit of their bargain. Plaintiffs and the other Illinois Subclass members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under 815 Ill Comp. Stat. 505/1, *et seq.*

87.     On or about May 25, 2022, Plaintiffs gave notice to Defendant that outlined Defendant's breaches of the ILCS.

**COUNT III**

**UNJUST ENRICHMENT**
**On behalf of the Plaintiffs and the Class against Defendant)**

88.     Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

89.     Plaintiffs and Class members conferred benefits upon Defendant. Plaintiffs and Class members paid money for Defendant's Non-Drowsy Products that they would not have purchased or would not have purchased on the same terms, had they known that the products cause drowsiness.

90.     Defendant has unjustly retained the benefits conferred upon by Plaintiffs and Class members.

91.     Defendant retained those benefits under circumstances that make it inequitable for Defendant to retain such benefits. Specifically, Defendant retained those benefits even though Defendant's Non-Drowsy Products cause drowsiness. If Plaintiffs and Class members had known the true nature of Defendant's Non-Drowsy Products, they would not have purchased the products. Plaintiffs and Class members are therefore entitled to disgorgement and/or restitution as prayed for hereunder.

92.     Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiffs and members of the Class is unjust and inequitable, Defendant must pay restitution to Plaintiffs and members of the Class for its unjust enrichment, as ordered by the Court.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed Classes, pray for relief and judgment against Defendant as follows:

a.      Certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as representatives of the Classes, and designating Plaintiffs' counsel as Class Counsel;

b.      Awarding Plaintiffs and the Classes compensatory damages, in an amount exceeding $5,000,000, to be determined by proof;

c.      Awarding Plaintiffs and the Classes appropriate relief, including but not limited to actual damages;

d.      For declaratory and equitable relief, including restitution and disgorgement;

e.      For an order enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

f.      Awarding Plaintiffs and the Classes the costs of prosecuting this action, including expert witness fees;

g.      Awarding Plaintiffs and the Classes reasonable attorneys' fees and costs as allowable by law;

h.      Awarding pre-judgment and post-judgment interest;

i.      For punitive damages; and

j.      Granting any other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury of all claims so triable.

Dated: May 31, 2022

Respectfully submitted,

By: */s/ Gary Klinger*
Gary M. Klinger
**MILBERG COELMN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
T: 865-247-0047
F: 865-522-0049
gklinger@milberg.com

Nick Suciu III*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Tel.:    (313) 303-3472
Fax:    (865) 522-0049
Email: nsuciu@milberg.com

J. Hunter Bryson*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
900 W. Morgan Street
Raleigh, NC, 27603
Tel: (919) 600-5000
Fax: (919)600-5035
Email: hbryson@milberg.com

**LEVI & KORSINSKY, LLP**
Mark S. Reich*
Courtney E. Maccarone*
55 Broadway, 10th Floor
New York, NY 10006
Telephone: 212-363-7500
Facsimile: 212-363-7171
Email: mreich@zlk.com
Email: cmaccarone@zlk.com

*Counsel for Plaintiffs*
* *pro hac vice* applications forthcoming